PAUL E. THOMPSON, Plaintiff and Respondent, v. OTTO MATTUSCHEK and FRANK MATTUSCHEK, Defendants and Appellants.

No. 9754.

Submitted June 30, 1958. Decided Jan. 9, 1959.
Rehearing Denied Jan. 28, 1959.
333 Pac. (2d) 1022.

Hall, Alexander & Kuenning, Great Falls, for appellant. Edward C. Alexander, Great Falls, argued orally.

DeKalb, Dockery & Mondale, Lewistown, for respondent. Raymond E. Dockery and H. Leonard DeKalb, Lewistown, argued orally.

MR. JUSTICE CASTLES:

This is an appeal from a judgment entered on a verdict of a Fergus County jury awarding the plaintiff $1,400 compensatory damages, together with $2,500 punitive damages in a trespass action. A motion for new trial was made and denied.

The plaintiff resides in Winifred. The defendants, brothers, live on their respective homesteads, each having acquired substantial ranching properties. At the close of plaintiff's case in chief, the defendant, Frank Mattuschek, was dismissed from the action on a judgment of nonsuit. He is of no further concern to this appeal. Otto Mattuschek is the only appellant and will be referred to as defendant. Respondent Thompson will be called the plaintiff.

The action was brought June 8, 1954, to restrain trespass by livestock and to recover for partial loss of a growing barley crop then being trampled and grazed down by livestock after the defendant had removed a long-standing section line fence bounding one side of a field which the plaintiff had just planted to barley. The fence was taken down by the defendant on May 14 and 15, 1954. The plaintiff did not specifically allege a secure

502

enclosure of the barley field but did so testify. He alleged a malicious removal of the fence.

The plaintiff's witness indicated a crop loss of twenty per-cent, amounting to seventeen bushels per acre, calculated on standard hail loss adjustment procedures. The crop covered eighty-three acres and the harvested yield was twenty-nine bush-els to the acre. The field was seeded in two plantings, inter-rupted by a light snow, over a ten-day period beginning April 27. The witnesses stated the barley had sprouted to a height of from about four to seven inches by the time the fence was taken down. The fence was rebuilt by June 8. All damage occurred in the interim.

The crop was harvested on August 29. The yield was 2,400 bushels, valued at $1.01 per bushel. The barley was combined by plaintiff and partially binned in two tanks on the premises, whether as harvested or two or three months later being in dis-pute. Some was stored on the ground between the tanks. The following spring it was all trucked fifteen miles to an elevator in Winifred and there sold.

The compensatory damages allowed by the jury are within $25.11 of the alleged 1,411 bushel loss, calculated at plaintiff's $1.01 figure; but under the prayer, as amended after the crop was combined, compensatory award for loss of grain was limited to the $1,400 recited in the amended prayer. Loss had origin-ally been estimated at $1,000. Additional damages of $350 for destruction of fence and $200 for loss of pasture at $1.00 per head per month were asked, but clearly were not allowed by the jury.

Possibility of hail damage was raised by defendant's testi-mony but was denied by plaintiff, and on this the jury accepted plaintiff's position. As shown above, from the time of seeding until the crop had sprouted to from four to seven inches, the east side of the field was completely open to trespassing live-stock.

Plaintiff purchased the field on which he seeded the barley as 180 out of 280 acres acquired on a sale contract made June

1, 1953. For some twenty years these lands had lain open to grazing livestock and had been treated as essentially open, public range.

Plaintiff and his witnesses testified that by May 14, 1953, plaintiff had enclosed the north, west and south sides of the barley field with a three-wire fence. This was done before the land was purchased. Plaintiff testified he did no fencing thereafter. However, plaintiff's own testimony and that of his witnesses confirms that while plaintiff tied the northeast corner of his closure to the existing east line fence, later removed by defendant, plaintiff left an eight-foot gap for a gate opening at the southeast corner of the field. This opening cornered with defendant's deeded lands in the section adjoining on the east and with a school section adjoining defendant's land on the south. The enclosure to which plaintiff testified was, therefore, not securely enclosed on the south.

Plaintiff claimed an interest in the east line fence saying he "figured" he "should own some of it for being there." This fence had been constructed in 1931 by defendant, Otto Mattuschek, in agreement and cooperation with a lessee of the then owner of the property which plaintiff later bought in 1953. This lessee, who testified for plaintiff, had helped build the fence but knew nothing of it after that time. He added, "In them days it was cheaper to move than to pay rent, I kept moving." Defendant testified that the witness had sold him the fence. The witness mentioned an "agreement" but did not explain further and neither counsel questioned him nor defendant Mattuschek as to the details of the sale of the fence.

Testimony indicates the course of the east line fence was actually over to the east of defendant's land in the next adjoining section, but that the fence had always been left as originally constructed in 1931 and had always been treated as a line division fence. The new fence built by defendant was fifteen feet east of the section line, which placed it fifteen feet over on defendant's deeded property and fourteen feet beyond the line of the old fence defendant had removed. This is consistent

504

with defendant's testimony that he and plaintiff had agreed to fence a fifteen foot lane on defendant's land for defendant's livestock to pass around plaintiff's barley field.

The testimony also shows that the line fence constructed by plaintiff along the south side of the barley field veered as much as nineteen feet to the southwest, running first through twenty acres of plaintiff's property and then on west within the public domain to the south of plaintiff's property. The eight foot gap left by plaintiff in 1953 added to the fifteen foot opening left when defendant built the new fence in 1954 makes a total opening of twenty-three feet in the south line fence at the southeast corner of the barley field through which cattle could have strayed and trespassed. Obviously any such opening, whether eight feet or fifteen feet or twenty-three feet wide would make an irresistible entrance for winter-hungry livestock, even when not leading into a lush green spring barley field. Nevertheless, plaintiff's case is that defendant's removal of the line fence was a studied plan to harass plaintiff and is the sole and proximate cause of the trespass for which plaintiff claimed compensatory and punitive damages.

Defendant Otto Mattuschek readily admitted removing the east line fence. He claimed he had bought it and alleged that it was torn down under an agreement with the plaintiff to make the lane. Defendant strenuously denied all malice.

Plaintiff admitted discussing building a lane fence but denied any such agreement. He conceded he had neither repaired nor constructed any part of the east line fence nor built any fence to make a lane, and he also admitted that except on one occasion he had never done anything to drive out the trespassing livestock which he said he saw almost every day in his barley field. His testimony on cross-examination is as follows:

"Q. How many times did you see livestock in [the barley field] there? A. I seen them in there several times, during the time that fence was down.

"Q. Well how many times? A. Fifteen or twenty times.

"Q. Fifteen or twenty, that's about every other day according to your testimony? A. Yes.

"Q. What did you do when you saw them in there? A. I did not do nothing.

"Q. You just left them in there? A. I drove them out once and they turned around and come back in. * * * you could see where they were coming in this gate in the road * * * a couple hundred head. * * *

"Q. Did you ever see any horses in there? A. There were ten head or fifteen head in there."

This testimony somewhat discounts plaintiff's position that his barley crop had been damaged solely by defendant Otto Mattuschek's trespassing cattle and solely because defendant Otto Mattuschek maliciously removed the line fence along the east side of the barley field.

In asking $200 for loss of pasture, the prayer of the complaint necessarily presupposes trespass by 200 cattle every day for thirty days or by more cattle on fewer days. Plaintiff introduced testimony that at one time or another from 70 to 150 cattle were seen ranging in the barley field. But it is apparent that there were both cattle and horses in the sprouting barley, variously owned, any of which could have entered either where the east fence was removed by defendant or through the gap left by plaintiff in the south fence, and it is equally apparent that these animals were seen by plaintiff and by his witnesses at distances from which certainly not all of their brands could have been read, even assuming, which was disputed, that their brands could have been read through their winter hair.

To place the location of the barley field and, more important, to fix it as a factor in the dispute, it should be said that when the barley crop was damaged by the trespassing livestock, plaintiff was, as stated, the sole contract purchaser of a block of 260 acres in Section 26 and of twenty acres in Section 35, both in Township 23 North, Range 19 West, M.P.M., Fergus County. Plaintiff's holdings are within and are entirely surrounded by defendant's deeded lands or by public range in

Sections 25 and 26 and Sections 35 and 36, Township 23 North, Range 19 East, M.P.M. During the twenty-six days the east line of plaintiff's barley field was not closed, livestock was roaming at will over the entire area, and as stated stock had roamed the area for many years.

Essentially, therefore, the dispute presented in this appeal is the inevitable frontier struggle between the long-established open range cattleman and the entering closed-field farmer, rancher against ''nester,'' cow versus plow, the western saga of the barbed-wire fence.

The defendant removed the fence, starting in the afternoon, after the plaintiff, with three companions, had cursed defendant during the morning and ordered him not to remove the fence.

Thus the gravamen is the removal of a line fence. No herd district is involved. R.C.M. 1947, sec. 46-1501 et seq.; sec. 46-1601 et seq.

Under common law, livestock must be fenced in, but under range law, they must be fenced out. R.C.M. 1947, sec. 46-1409. They may not be herded in damage of a neighbor, Herrin v. Sieben, 46 Mont. 226, 127 Pac. 323, and they wander at their own and their owner's risk of loss. Beinhorn v. Griswold, 27 Mont. 79, 69 Pac. 557, 59 L.R.A. 771, 94 Am. St. Rep. 818. But, in range country they may wander. They are not closed in.

The defendant specifies thirteen alleged errors which may be grouped as follows: (a) that no cause of action was stated and that all evidence was improperly received; (b) four instructions given for the plaintiff and two refused the defendant; and (c) that a new trial was improperly denied.

We have separately examined all thirteen specifications of error, but will discuss only those grouped under (a) and (b). Others require no comment except to say of those above that the court observed the witnesses, the jury found for the plaintiff, new trial was moved, briefed, argued, considered at length and denied. On such a record, we reverse only for manifest cause; an appeal presumes no error. R.C.M. 1947, sec. 93-3909; Lindeberg v. Howe, 67 Mont. 195, 215 Pac. 230; Koger

v. Halverson, 125 Mont. 560, 242 Pac. (2d) 273; Vail v. Custer County, 132 Mont. 205, 315 Pac. (2d) 993.

Legal fences are defined by section 46-1401, R.C.M. 1947. The jury's verdict confirms their finding that plaintiff's barley field was securely enclosed, as he testified, with a good, three-wire fence. But defendant's brief insists that no cause of action was stated because secure enclosure is not specifically alleged. The gravamen of plaintiff's allegation is that defendant "wilfully and maliciously tore down and removed a fence between the lands of said plaintiff and the said defendants * * * and * * * thereby caused * * * the said land of the plaintiff to be pastured and damaged, and the growing crops thereon damaged." It is true that plaintiff has not specifically pled that his field was securely enclosed with a lawful fence; but while preferable as pleading this is not imperative to the statement of this cause of action. "* * * a reasonable and substantial compliance with the [fencing] statutes is all that can be required" to erect a legal fence. Smith v. Williams, 1874, 2 Mont. 195. "Such an averment [lawful fence] would be a mere conclusion of law * * * whether or not it [the fence] is lawful is a question of law for the court under the evidence.

"The third argument [also advanced in the present appeal] is, that, as the cattle committed this trespass while * * * roaming at large, the breaking of respondent's inclosure is no trespass. As well might it be said that, because a man has the right to walk the streets in the night season, he could not commit a burglary." Nichols v. Dobbins, 1877, 2 Mont. 540. See also discussion in 2 Bancroft Code Pleading, Animals, sec. 855, pp. 1242-45.

Under the rule in Schmuck v. Beck, 72 Mont. 606, 234 Pac. 477, a line fence is a fixture. It is the jointly owned property of the coterminous landowners. It passes with the land. It may be sold only by the owners, and as a practical matter it can rarely be sold at all except between the owners. A line fence is more than metal fixed to poles or posts. It is a mutual barrier.

Securely in place, it becomes a legal barrier. Insecure, is it not a legal fence.

Absent agreement, a line fence may be removed by either owner only after six months notice to the other. R.C.M. 1947, sec. 67-806, provides: "* * * and if such fence be removed without notice * * * the person removing the same is liable to the person injured for all damages he may sustain thereby."

Under the foregoing authorities, plaintiff's complaint states a cause of action; neither as specifically nor as exactly as precise pleading would require, but a cause of action. The specifications grouped under (a) are not well taken.

The given instructions to which defendant objects need not be detailed. The correctly stated Montana range fence law and the grounds for awarding damages when that law is breached. In discussing these instructions, briefs for both parties make reference to Dunbar v. Emigh, 117 Mont. 287, 158 Pac. (2d) 311, 314, where the evidence showed that the defendant had cut fences and driven his cattle from his own to the plaintiff's lands and the lower court had issued a temporary restraining order which in effect denied defendant the right to graze his own cattle even on his own property. On defendant's appeal, this court dissolved the order insofar as it restrained defendant in the use of his own lands "even though they [defendant's cattle] might, *without negligence on defendant's part,* wander on plaintiff's property." Emphasis supplied. But in Dunbar v. Emigh, supra, this court quoted approvingly from Hill v. Chappel Bros., 93 Mont. 92, 18 Pac. (2d) 1106, 1109, as follows: " 'Fence laws do not furnish immunity to one who, in disregard of property rights, turns loose his cattle under circumstances showing that they were intended to graze upon the land of another'." Again quoting from Bolten v. Gates, 105 Colo. 571, 100 Pac. (2d) 145, the court said " 'it is equally well settled that the absence of a lawful fence does not justify a willful trespass'." This latter opinion cites Martin v. Platte Valley Sheep Co., 12 Wyo. 432, 76 Pac. 571, 78 Pac. 1093. The court in the Dunbar case also quoted with approval from Garcia v.

Sumrall, 58 Ariz. 526, 121 Pac. (2d) 640: " 'We think the rule laid down by the Colorado and Wyoming cases [Bolten v. Gates, 105 Colo. 571, 100 Pac. (2d) 145 and Martin v. Platte Valley Sheep Co., 12 Wyo. 432, 76 Pac. 571, 78 Pac. 1093] is more consonant with the situation prevailing in the grazing states * * * There must be some overt and unlawful act on the part of a defendant which tends to increase the natural propensity of cattle to wander and to direct them upon the premises of another'." Dunbar v. Emigh, supra, also quotes from Dorman v. Erie, 63 Mont. 579, 208 Pac. 908, to the effect that where a defendant's stock invades adjacent private property "through either his willful act or negligence, the existence of a partition fence or a legal fence is not material."

Appellant Mattuschek's brief asserts "In this case there is absolutely no evidence of an overt act on the part of the defendant *except the removal of the fence.*" Emphasis supplied. Exactly. But what further act is needed as proximate cause of "all damages he [plaintiff] may sustain thereby"? R.C.M. 1947, sec. 67-806.

Defendant also argues that the award of compensatory damages is speculative because he should have been credited with the cost of harvesting and marketing the barley and charged with compensatory damages only in the amount of plaintiff's net loss. We agree with plaintiff's position that because plaintiff did harvest his barley and his loss is claimed not in destruction of crop but in reduction of yield, the reduction itself is his net loss. As shown, at $1.01 per bushel, this loss amounts to $1,425.11. Thus, as said in Herness v. McCann, 90 Mont. 95, 104, 300 Pac. 257, 600, " [because] on a sale of the grain, plaintiff would have received the cost of producing as a part of the market price, defendants * * * would not be entitled to a deduction of that cost.

"* * * plaintiff testified that the cost of harvesting his grain in its damaged condition was the same as it would have been had the cattle not tramped and consumed a part thereof; this

testimony was not contradicted and [therefore] the element of cost of harvesting was eliminated."

The foregoing citations sustain our ruling that the trial court committed no error in holding that the complaint stated a cause of action and in giving the instructions to which defendant objected. As to defendant's specifications based on the instructions not given, one of which defines a legal fence and quotes section 46-1401, R.C.M. 1947, and the other of which instructs that under Montana law cattle may legally run and pasture at large, these instructions are amply covered by others given not only for plaintiff but for the defendant. Referring to costs and compensatory damages, we must say, therefore, again quoting Herness v. McCann, supra, 90 Mont. at page 105, 300 Pac. at page 260, "Other questions raised have been considered and found lacking in substance. The proof was sufficient to warrant the verdict and judgment." It is common knowledge that cattle will wander and it is elementary that fence lines must be respected. The specifications quoted under (b) have no merit.

The defendant, appellant herein, argues at length about the exemplary damages, contending first that no malice was shown to exist and second that the amount awarded was excessive. As to the first contention, we have already said that the overt act of removing the fence after being warned against it is sufficient.

The amount of exemplary damages does not appear excessive. Our statutes, in somewhat similar situations, recognize treble damages. R.C.M. 1947, sec. 17-503. This court in Truzzolino Food Products Co. v. F. W. Woolworth Co., 108 Mont. 408, 421, 91 Pac. (2d) 415, 419, said: "As to punitive damages, the decisions of this court have left the matter to the jury. It may make such award as is proper in its judgment under the circumstances. This court will not disturb the award unless its determination appears to have been influenced by passion, prejudice, or some improper motive, or unless the amount is out-

rageously disproportionate either to the wrong or the situation or circumstances of the parties. [Citing cases]."

For the foregoing reasons the judgment is affirmed.

MR. JUSTICE BOTTOMLY, ACTING CHIEF JUSTICE, and MR. JUSTICES ADAIR and ANGSTMAN, concur.

MR. CHIEF JUSTICE HARRISON did not participate in this opinion.